1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8

VALEO INTELLECTUAL PROPERTY,
INC.,

9                                    Plaintiff,                    CASE NO. C04-2406JLR

10          v.                                                      ORDER

11    DATA DEPTH CORPORATION,

12                                    Defendant.

13
14

## I.  INTRODUCTION

15          This matter comes before the court on the motion of Plaintiff Valeo Intellectual

16    Property, Inc. ("Valeo") for a preliminary injunction against Defendant Data Depth

17    Corporation ("DDC").  (Dkt. # 34).  The court has reviewed Valeo's moving papers,

18    DDC's opposition, extensive evidence from each party, and has heard oral argument.  For

19    the reasons stated below, the court DENIES Valeo's motion.

20
## II.  BACKGROUND

21          Valeo and DDC previously enjoyed a business relationship.  Valeo is a large entity

22    in the reprint services industry.  It licenses copyrighted material to a wide variety of

23    publishers.  Before DDC began its relationship with Valeo, it had a small base of

24    customers.  DDC's strength was in its proprietary licensing software ("the Software").

25    Publishers can use the Software to find, select, and license copyrighted content over the

26    internet.  One salient feature of the Software is DDC's "iCopyright Tag," a tag visible on

27
28

ORDER – 1

1   copyrighted content that serves as a hyperlink between the content and the Software that
2   would permit publishers to license it.

3        In May 2002, Valeo and DDC entered into an agreement ("License Agreement").
4   Under the terms of the License Agreement, DDC transferred its small customer base to
5   Valeo and granted a limited exclusive license to Valeo to use the Software within the
6   reprint services industry.  Valeo agreed to an initial payment and periodic royalty
7   payments to DDC.  DDC promised to provide assistance in selling the Software (and
8   implicitly, Valeo's reprint services) to publishing customers.  The License Agreement
9   also restricted Valeo's use of the Software's source code, obliged Valeo to identify DDC
10  as the source of the Software, and imposed confidentiality obligations on the parties.

11       Although there is no serious dispute about the above facts, the parties offer sharply
12  contrasting views of events that soured their relationship.  By late 2003, DDC began
13  discussing new software that would provide more powerful copyright licensing tools than
14  the Software.  The new technology would provide a "toolbar" that would analyze content
15  on web pages and inform publishers if the content was available to license.  The toolbar
16  would allow publishers to either instantly license or request licensing permission for
17  content.  DDC believed that the toolbar technology was independent of the Software, and
18  attempted to negotiate a higher royalty rate from Valeo.

19       Valeo, in turn, attempted to develop its own toolbar technology.  DDC claims that
20  Valeo misused confidential information and source code from the Software in this
21  attempt, a claim that Valeo vigorously denies.

22       By mid-2004, the parties were unable to agree on a new royalty rate, and their
23  relationship deteriorated.  Valeo claims that Michael O'Donnell, the CEO of DDC,
24  informed customers and potential customers that Valeo could not develop a toolbar
25  technology without infringing DDC's intellectual property rights and its rights under the
26  License Agreement.  Valeo describes his conduct as sabotage and an abuse of the position
27  of trust he had established with Valeo's customers when he was working with them to

28

ORDER – 2

1  promote the licensed Software on Valeo's behalf.  DDC contends that Mr. O'Donnell did

2  nothing more than inform potential customers about the new DDC technology, and

3  combat their misimpressions about Valeo's new technology.

4         On November 1, 2004, DDC sent Valeo a letter informing it of several alleged

5  material breaches of the License Agreement, and giving notice that it intended to

6  terminate the License Agreement in 30 days.  On November 30, 2004, Valeo filed this

7  lawsuit.  By mid-December, DDC began informing potential customers that it had

8  terminated the License Agreement.

9         Since the purported termination of the Agreement, DDC and Valeo accuse each

10 other of misrepresenting their relationship, the status of the License Agreement and the

11 Software, and the status of the parties' new licensing technologies.  Valeo claims that it

12 suffered reputational harm and the loss of at least one customer as a result.  DDC argues

13 that it has competed legitimately since the termination of the License Agreement.

14                              **III.  ANALYSIS**

15        Valeo seeks a three-pronged preliminary injunction.  First, it asks the court to

16 enjoin DDC's termination of the License Agreement.  Second, it asks the court to enjoin

17 DDC from breaching the exclusivity provision within the License Agreement.  Finally, it

18 asks the court to enjoin DDC from making false or misleading representations about

19 Valeo in the marketplace, including an injunction requiring DDC to modify a portion of

20 its website that provides information on this lawsuit.

21        In order to obtain a preliminary injunction, Valeo must satisfy either the

22 "traditional" or "alternative" test.  Under the traditional test, the court must find that:

23         (1) the moving party will suffer irreparable injury if the relief is denied; (2)
           the moving party will probably prevail on the merits; (3) the balance of
24         potential harm favors the moving party; and (4) the public interest favors
           granting relief.
25
26 Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987).  The alternative test requires the

27 court to find:

28

ORDER – 3

1
2

> (1) a combination of probable success and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor.

3 Id. (citations omitted).  The two prongs of the alternative test are not separate inquiries,

4 but rather "extremes of a single continuum."  Clear Channel Outdoor, Inc. v. City of Los

5 Angeles, 340 F.3d 810, 813 (9th Cir. 2003).  A strong showing of hardship means that the

6 plaintiff need not show as strong a likelihood of success, and vice versa.  See id.  The

7 court's ultimate decision on a motion for preliminary injunction is within its discretion.

8 Cassim, 824 F.2d at 796.

9 **A.     Valeo Is Not Entitled to Injunctive Relief Enforcing the License Agreement.**

10          Valeo argues that the License Agreement provides the basis for the first two

11 prongs of its requested injunction - undoing the termination of the License Agreement

12 and enforcing its exclusivity provisions.  The court analyzes these prongs together.

13          **1.     Valeo Makes a Mixed Showing of Its Likely Success on the Merits.**

14          The License Agreement allows a party to terminate it when a "material breach

15 remains uncured" for thirty days after the breaching party receives written notice.

16 License Agreement ¶ 5.10(A).  On November 1, 2004, DDC sent a letter to Valeo

17 identifying seven material breaches.  Kliebenstein Decl. Ex. U.  DDC now focuses on

18 four breaches that remained uncured by December 1, 2004, including:

19          (1)     use of the Software in violation of copyright law;

20          (2)     refusing to provide reports to allow DDC to audit Valeo royalty payments;

21          (3)     failure to display DDC copyright notices on the Software and pages that the

22                  Software generated; and

23          (4)     replacing DDC's "iCopyright tag" with a "V" tag to identify content

24                  licensed with the Software.

25          The burden of proof that each party bears on these contract issues dictates the

26 showing Valeo must make to establish a likelihood of success on the merits.  Valeo's

27 claim regarding the License Agreement reduces to a simple breach of contract.  It alleges

28

ORDER – 4

1    that DDC is no longer complying with the License Agreement, a charge DDC does not

2    dispute.  Instead, DDC offers the affirmative defense that it need not comply with the

3    License Agreement because it properly terminated it after Valeo materially breached.  See

4    Wise v. Farden, 332 P.2d 454, 455 (Wash. 1958) (noting that termination of contract is

5    an affirmative defense); A.G. Rushlight & Co. v. Johnson, 139 P.2d 280, 281 (Wash.

6    1943) (same).[1]  At trial, DDC would bear the burden of proof on this affirmative defense.

7    Wise, 332 P.2d at 456; A.G. Rushlight, 139 P.2d 283.  To show that it is likely to prevail

8    on its breach of contract claim, therefore, Valeo must show that it is unlikely that DDC

9    will prevail on its affirmative defense.

10        On the record before the court, Valeo has shown that it is not likely that DDC will

11    be able to prove that the Valeo toolbar technology is a work derived from the Software.

12    See Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1077-80 (9th Cir. 2000) (reviewing

13    "derivative works" doctrine).  If DDC could prove its claim, it would establish a material

14    breach of the License Agreement.  License Agreement ¶ 5.1(H) (providing that DDC

15    retains copyright in any elements of the Software that Valeo incorporates in derivative

16    works).  However, DDC's evidence that the Valeo toolbar technology is a derivative

17    work is, at this point, wholly circumstantial.  DDC argues that it provided Valeo

18    engineers with Software source code, and also described the DDC toolbar and its

19    functionality to Valeo engineers and James Tower, an independent software engineering

20    firm working for Valeo.  DDC also offers emails that purport to cast doubt on the ability

21    of Valeo engineers and James Tower to develop the Valeo toolbar technology.

22        Fatally missing from DDC's contentions is a comparison of the Software's source

23    code to source code from the Valeo toolbar.  That comparison is essential in determining

24    _____

25        [1]The parties do not address which state's law applies to the License Agreement.  The
     court thus applies Washington law.  Paracor Fin., Inc. v. GE Capital Corp., 96 F.3d 1151, 1164

26    (9th Cir. 1996) ("[W]here the federal court is exercising supplemental jurisdiction over state
     claims, [it] applies the choice-of-law rules of the forum state"); Burnside v. Simpson Paper Co.,

27    864 P.2d 937, 940 (Wash. 1994) (noting that where a party does not address choice-of-law

28    issues, a Washington court presumptively applies Washington law).

ORDER – 5

1   if the Valeo toolbar is a derivative work that infringes DDC's copyright in the Software.

2   Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002).  Without this

3   comparison, the court concludes that DDC is unlikely to prove the Valeo toolbar is an

4   infringing derivative work.  The testimony of a software engineer at James Tower that his

5   firm developed the Valeo toolbar technology without incorporating any DDC source code

6   only bolsters the court's conclusion.  Amend. Backman Decl. ¶ 8.  Valeo has thus shown

7   that it will likely prevail against this portion of DDC's affirmative defense.[2]

8           Valeo has also shown that its alleged breach with respect to royalty payments

9   under the License Agreement is not likely a material breach.  DDC presents no evidence

10  that Valeo has failed to pay amounts owed.  Instead, it argues that Valeo withheld reports

11  that would allow DDC to audit revenues to determine if it received proper payment.

12  License Agreement ¶ 7 (governing parties' audit obligations).  The record reveals that

13  Valeo has denied DDC access to online versions of the reports, but Valeo claims that it

14  has agreed to make the reports available in other ways.  DDC admits that it has

15  discontinued its efforts to conduct an audit on advice of counsel.

16          Under these circumstances, DDC is unlikely to prove that the breach of the audit

17  provision (if one occurred) was "material."  To determine if a breach is material, the court

18  must consider five factors:

19      (1) whether the breach deprives the injured party of a benefit which he
        reasonably expected, (2) whether the injured party can be adequately
20      compensated for the part of that benefit which he will be deprived, (3)
        whether the breaching party will suffer a forfeiture by the injured party's
21      withholding of performance, (4) whether the breaching party is likely to
        cure his breach, and (5) whether the breach comports with good faith and
22      fair dealing.

23  Bailie Communications, Ltd. v. Trend Business Systems, 765 P.2d 339, 343

24  (Wash. Ct. App. 1988).  Here, the evidence shows that both parties have frustrated

25  _____

26          [2]DDC also argues that Valeo violated confidentiality provisions in the License
    Agreement by using its toolbar concept.  DDC's practice of sharing the same information with
27  other entities (e.g., Microsoft) indicates that Valeo will likely show that the information was not
    confidential.
28

ORDER – 6

1    efforts to comply with the audit requirement.  On this record, the most likely

2    outcome at trial is a finding that any breach of the requirement was immaterial.

3         Similarly, Valeo's alleged failure to use the precise copyright notice that

4    DDC provided for the Software is likely not a material breach.  Although the

5    License Agreement requires Valeo to post copyright notices "as received from

6    DDC" (License Agreement ¶ 5.1(C)), the evidence shows that, at worst, Valeo

7    omitted copyright notices for only two days and posted copyright notices that

8    barely differed from the ones DDC provided.  Although this conduct may breach

9    the License Agreement, it is unlikely that a jury would find it a material breach.

10        The biggest obstacle to Valeo's chances of success on the merits is the

11   evidence showing that it breached its obligation to display DDC's iCopyright tag.

12   The License Agreement describes the iCopyright tag as "a fragment of HTML or

13   Javascript that uses the iCopyright C AND DESIGN trademark . . . as a

14   hyperlink . . . ."  License Agreement ¶ 5.3.   Valeo must use the iCopyright tag as

15   "the exclusive tagging device on works made available to users through the

16   Software . . . ."  Id.  There is no dispute that Valeo stopped using the visual

17   elements of the iCopyright tag and substituted a stylized "V" symbol.

18        In contrast to the breaches described above, DDC is likely to prevail on its

19   claim that Valeo's misuse of the iCopyright tag is a material breach of the License

20   Agreement.  It is evident that DDC required the use of its iCopyright tag to

21   identify DDC's integral role in providing content licensed under the Software.  It

22   is also evident that Valeo's alteration of the iCopyright tag was an effort to

23   promote itself at the expense of DDC.  Valeo argues that it was only required to

24   use the functional elements of the iCopyright tag, not the visual elements.[3]  The

25

26        [3]At oral argument, counsel for Valeo pointed to other entities that use the Software
27   without using the visual elements of the DDC iCopyright tag.  This evidence sheds no light on
     Valeo's obligations in this case.  On the record before the court, only the License Agreement
28   governs those obligations.

ORDER – 7

1    License Agreement demonstrates otherwise.  DDC retained the right to modify the

2    "general format" of the iCopyright tag without altering its functionality; Valeo had

3    no such right.[4]  Id.  The court finds that a jury is likely to find that this breach was

4    material and justified DDC's termination of the License Agreement.

5           Valeo's final License Agreement-based claim is for injunctive relief

6    enforcing the exclusivity provision against DDC.  License Agreement ¶ 5.1(B)

7    (defining limited exclusivity of Software license).  There is no dispute that DDC is

8    no longer complying with the exclusivity provision.  The dispute is rather whether

9    the License Agreement has terminated, and thus whether there is an exclusivity

10   provision for the court to enforce.  As discussed above, Valeo has not shown that

11   it is likely to prevail in showing that the License Agreement still binds DDC.

12          To summarize, the court finds that Valeo has shown that it is likely to

13   prevail on its breach of contract claim against three of the material breaches DDC

14   offers as an affirmative defense, but not against DDC's affirmative defense that

15   DDC wrongfully failed to display the iCopyright tag.  With this picture of Valeo's

16   overall likelihood of success in mind, the court turns now to Valeo's alleged

17   irreparable harm.

18          **2.      Valeo Has Not Clearly Shown Irreparable Harm.**

19          Valeo claims that DDC's termination of the License Agreement has caused

20   irreparable harm and will continue to do so.  To establish irreparable harm, Valeo

21   must do more than merely allege it, it must "*demonstrate* immediate threatened

22   injury as a prerequisite to preliminary injunctive relief."  Caribbean Marine Servs.

23   Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).  Valeo

24   claims that DDC's "wrongful termination" has damaged its reputation and

25   goodwill.  The only evidence it offers, however, is a series of emails wherein Mr.

26   _____

27          [4]Valeo points to a separate section of the Agreement that grants it a permissive license to
     use DDC trademarks.  License Agreement ¶ 5.5.  The court finds that the more specific
28   requirements in Paragraph 5.3 pertaining to the iCopyright tag supersede this provision.

ORDER – 8

1    O'Donnell responds to inquiries from customers and others in the industry about

2    the dispute between Valeo and DDC.  These emails merely indicate industry

3    interest in the dispute, they are not evidence that Valeo's reputation has suffered or

4    that it has lost goodwill.

5         Valeo also argues that the termination of the License Agreement is itself a

6    source of irreparable harm.  The only legal authority that it offers, however, are

7    two easily distinguishable cases where a plaintiff faces the loss of its license to do

8    business.  Valeo's Mot. at 15-16.  There is no evidence that the termination of the

9    License Agreement has caused or will cause Valeo any comparable harm.[5]  Indeed,

10   Corey Johnson, a Valeo vice-president, assured at least one customer that its

11   dispute with Valeo would not affect its business.  Kliebenstein Decl., Ex. Y.

12        Valeo claims it will suffer the irreparable harm of losing customers.  It

13   points to evidence that a single customer, with whom Valeo had already been

14   unsuccessful in negotiating an agreement, cited Valeo's dispute with DDC as an

15   additional reason for cutting off negotiations.  Although this evidence may suggest

16   a possibility of irreparable harm, it falls short of Valeo's obligation to provide

17   clear evidence that it will face irreparable harm in the future.  Caribbean Marine

18   Servs., 884 F.2d at 674 (noting that "speculative injury" is not "irreparable

19   injury").  The only other customer that Valeo points to in support of its claims

20   declared that it was never close to a deal with Valeo.  O'Donnell Decl., Ex. R.

21   This admission serves only to highlight the dearth of evidence supporting Valeo's

22   claim that it has lost or will lose customers.

23        Finally, Valeo's delay in seeking injunctive relief belies its claims of

24   irreparable harm.  The evidence reveals that Valeo knew of the threat that DDC

25

26        [5]The proviso in the License Agreement that "noncompliance with the terms of this
27   Agreement may cause irreparable injury" has negligible impact here.  License Agreement
     ¶ 11.13.  Valeo cites no authority that such a clause lessens its burden to prove it has suffered or
28   will suffer irreparable harm.

ORDER – 9

1   would terminate the agreement by mid-2004, and in any event no later than DDC's

2   November 1, 2004 letter informing Valeo of its intent to terminate.  Faced with the

3   termination of the License Agreement that Valeo now claims will cause it

4   irreparable harm, Valeo moved slowly.  It filed this lawsuit on November 30,

5   2004, but did not seek injunctive relief until it filed this motion three months later.

6   Valeo's only explanation for the delay is that it required discovery.  The court

7   finds that discovery was of little value to Valeo's claims under the License

8   Agreement, and thus does not accept this explanation.  A three-month delay in

9   seeking injunctive relief is inconsistent with Valeo's insistence that it faces

10   irreparable harm.  Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d

11   1374, 1377 (9th Cir. 1985).

12          **3.     Valeo's Evidence Does Not Warrant a Preliminary Injunction
                     Enforcing the License Agreement.**

13          Having examined Valeo's likelihood of success on the merits and its claims

14   of irreparable harm, the court returns to the standards for granting injunctive relief.

15   Under the traditional test, Valeo has not established a likelihood of success on the

16   merits, and thus the court need not consider the remaining elements of the

17   traditional test.  See Nordyke v. King, 319 F.3d 1185, 1188 (9th Cir. 2003)

18   (affirming injunction).

19          Under the alternative test, the court holds that the evidence Valeo presented

20   does not establish "probable success" on the merits of its claim.  Cassim, 824 F.2d

21   at 795.  The court also finds that Valeo has not raised "serious questions" about its

22   likelihood of success on the merits.  Id.  Even if it had, however, Valeo has not

23   shown that the "balance of hardships tips sharply in its favor."  Id.  Valeo has not

24   shown that the termination of the License Agreement has caused it undue hardship.

25   Thus, regardless of the harm DDC would suffer under an injunction, the balance

26   of harms does not tip sharply in Valeo's favor.  Under these circumstances, the

27   court declines to grant injunctive relief enforcing the License Agreement.

28

ORDER – 10

**B.     Valeo Is Not Entitled to an Injunction Preventing DDC From Presenting Its Side of This Dispute in the Marketplace.**

Valeo contends that under both the Washington Consumer Protection Act ("WCPA") and the Lanham Act, it is entitled to an injunction against DDC's purported misrepresentations.  The court finds that Valeo has failed to show an injury under either statute.

Although Valeo describes DDC's misrepresentations in numerous ways, they reduce to DDC's claims to customers and others within the industry that Valeo's toolbar technology or any other Valeo licensing software would incorporate portions of the Software and thus would violate copyright law, patent law, and the License Agreement.  From the record before the court, it appears that the only DDC agent to make these alleged misrepresentations was Mr. O'Donnell, who made them in response to inquiries about the lawsuit from customers and others within the industry.  The only other misrepresentation alleged is DDC's statement in a December 29, 2004 press release that it had terminated the License Agreement.

The relevant requirements of the WCPA and Lanham Act are similar.  A WCPA plaintiff must show, among other things, an unfair or deceptive act in the course of business or commerce that affects the public interest.  Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 719 P.2d 531, 532 (Wash. 1986).  A Lanham Act plaintiff must show a false or misleading representation of fact.  15 U.S.C. § 1125(a).

On the record before the court, Valeo cannot prevail on its WCPA and Lanham Act claims.  Valeo ignores the context of all of the alleged misrepresentations.  All of them occurred in response to customers and others in the industry who inquired about the dispute between DDC and Valeo.  When asked, Mr. O'Donnell responded with the very allegations that DDC presses to support its counterclaims and affirmative defenses in this lawsuit.  These

ORDER – 11

1   representations may be "false" in the sense that a trier of fact may ultimately find

2   in Valeo's favor on some or all of them, but in the context in which Mr. O'Donnell

3   delivered them, they appear not as representations of fact, but as representations of

4   DDC's positions in this dispute.

5          For example, Mr. O'Donnell has responded to some potential customers

6   and asserted that any software that Valeo provided "would not only infringe our

7   copyrights and pending patents, but would violate the confidentiality and licensing

8   agreement."  Putting aside Mr. O'Donnell's mistaken impression that it is possible

9   to infringe a pending patent, he has done no more than to state DDC's position in

10  this lawsuit.  Although the court looks unfavorably on the hyperbole in Mr.

11  O'Donnell's statements, particularly his allegations that Valeo "stole" intellectual

12  property, it does not find that they warrant injunctive relief.[6]  Such statements, in

13  response to inquires from people in the industry familiar with the instant dispute,

14  are not likely to deceive or mislead.  They are no more than a litigant's

15  unsurprisingly favorable view of its own side of a lawsuit.

16         The court finds no merit to Valeo's claim that DDC's December 29 press release is

17  false, misleading, or deceptive.  The press release states only that DDC terminated the

18  License Agreement, and that part of the motivation for the termination was DDC's need

19  to protect its intellectual property.  The court finds nothing even potentially false or

20  misleading in the press release.

21         Finally, the court denies Valeo's request for an injunction requiring DDC to post

22  all documents from this litigation on the DDC website.  This request stems from Valeo's

23  concern that because DDC has posted some, but not all, of the pleadings in this action on

24  its website, the public will be misled.  Valeo does not contend that the documents DDC

25

26         _____

          [6]The court also finds little merit in Valeo's allegations that Mr. O'Donnell abused the
27  position of trust he gained while working on behalf of Valeo to promote the Software.  In every
    communication before the court, Mr. O'Donnell makes it abundantly clear that he was acting on
28  DDC's behalf, not Valeo's.

ORDER – 12

1  has posted are false, deceptive, or misleading.  In essence, Valeo seeks to force DDC to

2  convert its website into a forum for what it believes is a more neutral presentation of this

3  lawsuit.  Valeo does not explain why it is incapable of providing its own forum to present

4  this lawsuit in the manner it prefers.  Valeo does not explain how the court could force

5  DDC to provide such a forum without violating the First Amendment.  See New.Net, Inc.

6  v. Lavasoft, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003) (finding that First Amendment

7  bars preliminary relief enjoining competitor's speech).  Valeo fails to cite authority for the

8  proposition that either the WCPA or the Lanham Act empowers the court to take such

9  drastic action.  The court declines to enjoin DDC's representations about its dispute with

10  Valeo.

11                                        **IV.  CONCLUSION**

12          Generally, the court prefers to provide explicit findings of fact and conclusions of

13  law in support of an order on a motion for preliminary injunction.  Fed. R. Civ. P. 52(a).

14  Here, the court has eschewed an enumerated list of factual findings in favor of an

15  explanation of how the conflicting evidence leads to the conclusion that Valeo has not

16  established a likelihood of success on the merits of its claim.  FTC v. H. N. Singer, Inc.,

17  668 F.2d 1107, 1109 (9th Cir. 1982) (noting that explicit factual findings are

18  unnecessary).

19          For the foregoing reasons, the court DENIES Valeo's motion for a preliminary

20  injunction.  (Dkt. # 34).

21          Dated this 5th day of May, 2005.

22

23

24          _____

25          JAMES L. ROBART
            United States District Judge

26

27

28

ORDER – 13